UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DEMOND HARRIS,

        Petitioner,

v.                                   CASE NO. 07-cv-13034

                                         HONORABLE STEPHEN J. MURPHY, III

JOHN PRELESNIK,

        Respondent.

_____/

## OPINION AND ORDER CONDITIONALLY
## GRANTING THE WRIT OF HABEAS CORPUS

      This matter is pending before the Court on petitioner Demond Harris's application for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition challenges Harris's state convictions for assault with intent to do great bodily harm less than murder, armed robbery, and possession of a firearm during the commission of a felony ("felony firearm"). Harris claims that his trial attorney provided ineffective assistance by failing to produce certain witnesses at trial and by failing to ask the complaining witness whether he had ever been convicted of a weapons offense. For the reasons stated below, the Court agrees with Harris that his trial attorney was constitutionally ineffective and that the ineffectiveness prejudiced Harris's defense. Accordingly, it will issue a conditional writ of habeas corpus.

# I. BACKGROUND

## A. Harris' Criminal Trial, Sentence, and Appeal

Harris was tried before a jury in a two-day trial on May 19-20, 2003. He was convicted of assault with intent to do great bodily harm, Mich. Comp. Laws §750.84; two counts of armed robbery, Mich. Comp. Laws § 750.529; and one count of felony firearm, Mich. Comp. Laws § 750.227b. He was sentenced to four years, ten months to ten years' imprisonment on the assault conviction; fifteen years to thirty years imprisonment on the armed robbery counts; and two years imprisonment on the felony firearm conviction. The assault and armed robbery sentences are being served concurrently with each other but consecutively to the mandatory two-year sentence on the felony firearm conviction.

Harris' brief on his appeal to the Michigan Court of Appeals recites the following facts concerning his criminal trial, which were not contested by the state and which are reproduced here for reference:

> At the trial, Kenneth Hardin, Jr. stated that in January, 2003, he was living with his cousin, Rochelle Gilmer, at 8930 Goodwin Street, Detroit. According to Mr. Hardin, Defendant Demond Harris was Ms. Gilmer's fiancé and stayed in the home sometimes but not always. (Trial transcript, hereafter referred to as "T" for proceedings held May 20, 2003, followed by a page reference; T 4-5). Mr. Hardin[1] said that some time after midnight January 3, 2003, he was awakened by Mr. Harris shouting at him to get up, "you're going to the ATM machine," while poking Mr. Hardin with a shotgun (T 7). The witness said he got up and dressed, gave his ID and ATM card to Mr. Harris and the two went downstairs, where they met Stefan Jones.[2] The three men drove to a bank, with Mr. Hardin in the back seat, the other two in the front, and the shotgun on the floor of the back seat of the car. Hardin

---

[1] Harden is referred to as both "Hardin" and "Harden." The original spelling is retained.

[2] Jones's first name appears in the record both as "Stephen" and as "Stefan." The Court will use the spelling "Stefan."

said he was given back his ATM card, and told to withdraw $175. When the machine would not allow that large a withdrawal, he was told to, and did, withdraw $100 and give it to Mr. Harris. He was given back his ID, but, according to Mr. Hardin, Mr. Harris kept the ATM card because he was going to come back the next morning and make Mr. Hardin get out more money (T 9-10). Stefan Jones dropped Mr. Hardin off at the Goodwin address.

Mr. Hardin called the police, who came to the house and took a report. In order to try to "set up" Harris and Jones so that the police could arrest them, Hardin said he called Mr. Harris at about 9:00 in the morning and was told they would be over in about a half hour. Mr. Hardin said he then called the Detroit police and told them this. He was told to call when the two were there. (T 11-12). Mr. Hardin said that at 11:22 he saw Mr. Harris "creeping" from the backyard toward the house. Hardin called the police on his cell phone; when Mr. Harris saw this, he stuck the shotgun in Hardin's back and told him to get into the car. Stefan Jones was in the car. The three went to a different branch of Mr. Hardin's bank and had him withdraw $100 from his savings account at the drive through window (T 14-15). He was taken back to the house on Goodwin and dropped off once again. Mr. Hardin stated that at that point he took a few of his belongings and went to his parents' house (Id.). He reported this to the police.

On January 15, 2003, Mr. Hardin says he went back to the Goodwin house for the first time to get more of his personal property because he got a call from his cousin and he thought Mr. Harris would not be around. (T 18). He arrived on his bicycle and went to the second floor bedroom which had been his. He saw Mr. Harris sitting on his cousin's bed in her room. He got some books and clothes and "rushed" downstairs. As he did this, Stefan Jones came up to the house, slammed the door and said "Bitch, you ain't going nowhere." Hardin said Mr. Harris came down the stairs and that Harris and Jones "slammed" his head into the wall three times (T 18-21).

Saying that they were angry for reporting the robberies to the police, Hardin said at trial that the two men beat him up, and, when they got to the kitchen, they both got knives and Harris stabbed Hardin in the back. Jones left, Harris told Hardin to leave, and he did (T 22-25). He rode his bike back to his parents' home, where the police were called and responded, and Mr. Hardin was taken by EMS to the hospital for stitches. Eventually Mr. Hardin talked to the officer in charge of the case. (Id)

On cross examination, Mr. Hardin agreed that the bank statement admitted into evidence showed that he made a withdrawal of $150 on January 3, 2003 before the $100 withdrawal he described as happening just after midnight, although he insisted that the $150 withdrawal was made after he was back at his parents' house, and was used to pay his January rent. (T

3

33). He agreed that none of his things, including a small tv and other items, were missing or disturbed when he returned for them on the 15th. Hardin also admitted that he received no injuries from the assault on January 15th except the cuts from being stabbed (T 76).

Detroit police officer Zarosly stated that he took a radio call to 8930 Cameron on January 3, 2003 at about 2:00 a.m. Arriving there and finding no house at that address, he and his partner looked on nearby streets and found 8930 Goodwin (T 96). They spoke to the complainant, Mr. Hardin, at that time. In addition, Investigator Soviak testified that the first report was based on what Mr. Hardin told Officer Zarosly. (T 105).

Investigator Soviak stated at trial that he was assigned to both the robbery complaints and assault complaint. He indicated that he made contact with Mr. Harris, who denied the robberies, but said that Mr. Harden did owe him money, and he did take him to the bank to withdraw money to pay him back (T 103-4).

The hospital record was received into evidence with no objection (T 114).

The defense recalled Mr. Harden and questioned him about the facts as he'd stated them earlier in the trial, highlighting that the first police report indicated that Mr. Harden claimed at the time that Mr. Harris first asked to borrow money, was refused, pointed the shotgun at Haardin (sic) and ran away when Mr. Harden picked up the telephone to call 911 (T 117). Officer Zarosly was recalled as a witness and confirmed that these were the allegations in the first report. (T 120).

In closing, defense counsel pointed out that the report made of that first encounter varied dramatically from what Mr. Harden had portrayed in his testimony at trial (T 142-43), and that there was no evidence that the police told Mr. Harden to call back the next day when the perpetrators came back.

Defense counsel moved for a directed verdict as to the armed robbery counts and felony firearm counts related to them; the motion was denied (T 123-25).

Defendant was sentenced as outlined above.

A post-judgment investigation led to the filing of a motion for new trial, based on the yet unsigned affidavit of Stefan Jones. At a hearing held January 30, 2004, the motion was denied, along with appellate defense counsel's request for appointment of an investigator to find Mr. Jones, who had failed to come to counsel's office and sign the affidavit (which was based

on a telephone interview with Mr. Jones by counsel). A second motion, to correct sentence, was granted, where the Michigan Department of Corrections had not made the non-felony firearm sentences concurrent.

Defendant-Appellant's Brief on Appeal, Docket No. 9, Ex. 5 at 26-29.

Harris timely appealed to the Michigan Court of Appeals on the ground of ineffective assistance of counsel, based on his attorney's failure to call Stefan Jones as a witness. The Court of Appeals denied Harris's appeal in an unpublished *per curiam* opinion dated December 28, 2004. Two judges on the three-judge panel stated that the circumstances surrounding Jones's affidavit were questionable, and that the record contained no insight from Harris's trial counsel by way of affidavit or appearance and testimony that could have been compelled through subpoena. The Court of Appeals was unable to conclude that counsel's performance was deficient, that Harris was denied a substantial defense, or that Harris had overcome the strong presumption that counsel's performance constituted sound trial strategy. The dissenting judge, Helene N. White, voted to remand the case for an evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436 (1973).

Harris filed an application with the Michigan Supreme Court for leave to appeal. His application was denied on September 21, 2005 because the Court was not persuaded that the questions presented should be reviewed by the Court. Two Justices dissented and stated that they would remand for a hearing pursuant to *Ginther*. *See People v. Harris*, 474 Mich. 865 (2005) (table).

Harris filed a motion for relief from judgment in which he alleged that trial counsel was ineffective for not calling Stefan Jones and Phillip Franklin as witnesses.[3] He also

_____

[3] While Harris's motion was pending in the trial court, Harris filed a habeas corpus petition, which was assigned to United States District Judge Paul V. Gadola.

claimed that appellate counsel was ineffective for failing to raise those issues in the appeal of right. The trial court denied Harris's motion on the ground that he was precluded from presenting the same argument that he raised in his appeal of right and that he failed to meet the "good cause" and "actual prejudice" standard of Michigan Court Rule 6.508(D)(3). The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal the trial court's decision for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Harris*, No. 270181 (Mich. Ct. App. Nov. 9, 2006); *People v. Harris*, 478 Mich. 924 (2006) (table).[4]

B. The Federal Court Proceeding

    1. The Petition and Motions

Harris filed a pro se habeas corpus petition on July 20, 2007. He alleged that his trial attorney should have produced Stefan Jones and Phillip Franklin as witnesses and investigated whether Kenneth Harden had been convicted of a crime. The State argued in an answer to the petition that Harris's allegations lacked merit, and that his argument about Phillip B. Franklin was procedurally defaulted because Harris first presented that claim to the state court on collateral review.

Harris subsequently moved to hold his habeas petition in abeyance so that he could pursue additional state court remedies. The Court then appointed counsel, who consulted

---

Judge Gadola dismissed the habeas petition without prejudice because Harris's motion for relief from judgment was pending in the trial court. *See Harris v. Prelesnik*, No. 06-15472 (E.D. Mich. Dec. 20, 2006).

    [4] Justice Marilyn Kelly voted to grant the application for leave to appeal and to remand the case to the trial court for a *Ginther* hearing on Harris's claim of ineffective assistance of counsel.

with Harris and moved to withdraw the motion for a stay. Counsel also moved for an evidentiary hearing and for leave to file an amended petition. The Court permitted Harris to withdraw his motion for a stay and to amend his petition to add an additional claim that his trial attorney was ineffective for failing to present a defense. The Court also granted Harris's motion for an evidentiary hearing.

### 2. The Evidentiary Hearing

On August 12, 2010, this Court conducted the evidentiary hearing on Harris's ineffective-assistance-of-counsel claim. Petitioner called four witnesses at the evidentiary hearing: (1) his trial counsel; (2) Stefan Jones, the witness who Harris alleged was available to testify on Harris' behalf in state court proceedings; (2) Daphne Harris-Jones, Harris's sister and the wife of Stefan Jones; and (4) Harris. The State cross-examined Harris's witnesses, but did not present any witnesses or documentary evidence at the hearing.

### a. Harris's Trial Counsel

Harris's trial attorney testified that he had an independent recollection of Mr. Harris's case. Transcript of August 12, 2010 Evidentiary Hearing (hereafter "Evid. Tr.") at 7. He testified that he was retained to represent Demond Harris by Daphne Harris-Jones sometime shortly after Harris's preliminary exam. *Id.* He also testified that he met with Harris at the Wayne County Jail, and obtained discovery and the preliminary exam transcript. Harris was charged with two separate armed robberies committed on the same day (January 3, 2003), as well as a separate assault with intent to commit great bodily harm less than murder, committed about two weeks later (January 15, 2003). The two cases were joined for trial at the preliminary exam.

Counsel testified that Harris denied committing the offenses as charged. Evid. Tr. 10. Counsel testified, however, that Harris had told him that he and other individuals with whom he worked had extorted money from the complaining witness on other occasions, when he received disability checks, and that this had gone on for several months, Evid. Tr. 11, but that they did not do so on the date in question. Evid. Tr. 10. Counsel testified that it was his recollection that Harris knew the complaining witness through Harris's work at a group home. Evid. Tr. 11. Counsel stated that Harris never told him that the victim owed money to Harris. Evid. Tr. 12. Harris had told his counsel that a gun was never involved on any occasion, nor was physical harm ever done to the complainant. *Id.* Harris also told his counsel that Stefan Jones had participated in extorting money from the victim on previous occasions. Evid. Tr. 34.

Counsel agreed that discovery revealed, and Harris confirmed, that Stefan Jones was present at all three of the crimes alleged. Evid. Tr. 13-14.

Counsel could not specifically recall interviewing Rochelle Harris or Stefan Jones. Evid. Tr. 17-18. Counsel stated that he believed Mr. Jones "was the man that came in with his, his female relative that engaged me, [and he] denied any and all knowledge of what had taken place. They sat there and they stated that they had no idea what led to these events that had taken place." Evid. Tr. 29-30. Counsel testified that he "spoke with every witness and every person who was a family member, everyone to came in (sic). Everyone denied any and all knowledge of the events that had taken place in January of, it's '03. Nobody had any idea how these things had taken place and I had inquired of each one." Evid. Tr. 18. When asked specifically about Mr. Jones's name showing up in discovery as being present at each of the incidents, counsel reiterated that all witnesses denied knowing

8

anything about the facts giving rise to the charges at issue. Evid. Tr. 18.

Asked about his strategy in terms of investigation, counsel testified that he believed that the complainant had fabricated some of his statements. Evid. Tr. 18-19. Counsel testified that comparing the statements made in the police reports to the testimony at the preliminary exam created credibility issues relating to the complainant's testimony. Evid. Tr. 19.

Counsel testified that he retained an investigator who contacted the bank where the withdrawals took place, but was unable to come up with any videotape, documentary evidence or witnesses that would support Harris's case. Evid. Tr. 23-24. Counsel testified that he did not look for witnesses that could testify as to the bank's description of the events because he "went under the assumption that it would not prove to be beneficial to me so I didn't want to disprove what appeared to be beneficial to Mr. Harris." Evid. Tr. 25. Counsel testified that after he investigated the case and reviewed the discovery, he and Harris "discussed the issue of potentially calling witnesses, umm, but he and I spoke about that I think we collectively decided that that was not in his best interest." Evid. Tr. 16. Counsel testified that he did not present any witnesses "out of concern what those witnesses may say." Evid. Tr. 23. Counsel could not recall if a plea offer was made, but said that he believed there was a plea offer at the bottom of the guidelines range, although he could not remember specifically. Evid. Tr. 17.

Counsel testified that the victim had the "mentality of perhaps a six to eight-year-old child" and it was his "hope that the case would rise and fall based upon the credibility of the complaining witness." Evid. Tr. 19, 20. Upon cross-examination by the State, counsel testified that he called no defense witnesses because there were no witnesses that could

9

testify on behalf of his client that would not inculpate his client in other, uncharged, criminal activity in relation to the complaining witness.  Evid. Tr. 36.

   b..Stefan Jones

Jones testified that he was present at the two alleged robberies on January 3, 2003 and at the assault on January 15, 2003.

Jones testified that, around midnight on January 3, 2003, Harris called him and asked if Jones could take Harden to the bank.  Evid. Tr. 41.  Jones stated that Harris told him that Harden owed Harris money and Harden was supposed to withdraw it from the bank that night when money was deposited on his ATM card.  *Id.*  Jones stated that it was his understanding that Harden could withdraw the money after midnight.  *Id.*  Jones stated that he arrived at the house and both Harris and Harden came out.  *Id.*  The three of them then drove to a bank on Twelfth Street.  *Id.*

Jones did not see Harris point a gun at Harden.  *Id.*  He stated that there was no gun in his vehicle.  *Id.*  Jones testified that when they arrived at the bank, Harris and Harden walked up to the ATM.  *Id.*  They were there a few minutes before returning to the car, and Jones dropped them off at home.  *Id.*  Jones did not observe any coercion or threats of violence.  *Id.*

Jones testified that he also drove Harden and Harris to the bank the following morning.  Evid. Tr. 42.  Jones did not see a weapon in the car and Harris did not threaten Harden in Jones's presence.  *Id.*  Harden did not appear to be intimidated by Harris.  *Id.*

Jones testified that he also had knowledge of the events of January 15, 2003, which formed the basis for Harris's conviction on the charge of assault with the intent to do great bodily harm.  Evid. Tr.  42.  Jones testified that Harris called him and told him that Harden

had told the police that he had been robbed by Jones and Harris.  Evid. Tr. 43.  Jones testified that he went to the Harris house to talk to Harden and Jones and Harden got into an argument.  *Id.*  The argument devolved into a fistfight.  *Id.*  Jones testified that Harden ran into the kitchen, followed by Jones, and the two continued to argue.  *Id.*  Jones testified that Harden then reached behind the refrigerator and pulled out what looked like a rifle.  *Id.*  Jones testified that Harris rushed Harden and grabbed him and, at the same time, Jones grabbed a knife off of the sink and ran toward Harden and the three struggled.  *Id.*  All three fell, and Harden pulled the trigger of the gun and it made the sound of an air gun.  The three were still wrestling and, when they finally got up, Harden said, "I'm cut, I'm cut."  *Id.* at 44.  Jones then said he was leaving, but Harris stayed and helped bandage Harden's back.  *Id.*

Jones testified that he was never interviewed by the police about any of the incidents and was never charged with any crimes in connection with them.  *Id.*

Jones also testified that he met petitioner's counsel on several occasions in connection with the Harris trial.  Jones testified that his wife, Daphne Harris-Jones, called an attorney on Harris's behalf, and afterwards the two of them went to the attorney's office to pay him a retainer.  Evid. Tr. 44.  Jones testified that at that meeting he told Harris's counsel essentially the same facts that were in his affidavit.  *Id.*  Jones denied telling counsel that he knew nothing about the events that took place and denied telling counsel that he could not be a witness.  Evid. Tr. 45.  Jones testified that counsel for Harris came to the Jones's house on the first day of every month prior to Harris's trial to pick up his retainer, which Daphne Harris-Jones was paying in monthly installments.  Evid. Tr. 45.

On cross-examination, Jones testified that his wife paid Harris's legal bills because

she was Harris's sister. Jones admitted that he did not contact the police and tell them the circumstances leading to Harris's arrest and trial. He also stated that he was not aware that the statute of limitations had run on any charges that may be asserted against him as a result of these events. Evid. Tr. 47.

### c.  Daphne Harris-Jones

Daphne Harris-Jones is the sister of petitioner Demond Harris and the wife of Stefan Jones. She is the person who retained trial counsel to represent Harris in his criminal trial. Evid. Tr. 49. Harris-Jones testified that she retained Harris's trial counsel because he had previously successfully represented another brother, Kiron. *Id.* at 49-50. Harris-Jones and her husband went to counsel's office, paid counsel an initial retainer, set up a monthly installment plan, and spent about an hour discussing the details of the case. *Id.* at 50. Harris-Jones said that she did not talk about the details of Harris's case at that meeting because she did not know what was going on, but her husband Stefan Jones talked about the details. Evid. Tr. 51. Harris-Jones testified that what her husband told counsel at that meeting was consistent with Jones's earlier testimony at the evidentiary hearing. *Id.*

Harris-Jones stated that she spoke to counsel on several occasions after their initial meeting, both on the phone and in person, when counsel would come to the Jones' house to pick up his retainer. Evid. Tr. 51. Counsel told Harris-Jones that he felt he had the case beat. *Id.* Harris-Jones specifically asked whether counsel would be calling her husband as a witness, and counsel told her that he did not need Jones as a witness because "he felt that he had the case beat." *Id.* Harris-Jones also testified consistently with her earlier affidavit that counsel for Harris had called her on the day of the trial and told her to tell her husband not to come to court that day because "he really had this case in the bag." Evid.

12

Tr. 54. Harris-Jones testified that Jones did in fact go to court that day anyway. *Id.*

Harris-Jones testified that she spoke to counsel once after the trial when he came and picked up his last payment. Evid. Tr. 55. Counsel told Harris-Jones that he was going to file an appeal for Harris. *Id.* Harris-Jones did not know if counsel did in fact file an appeal. *Id.*

### d. Demond Harris

Petitioner Demond Harris testified contrary to the testimony of his trial counsel in a number of critical areas. Harris testified that he told his counsel that the complaining witness lived with Harris and his wife, contrary to Harden's testimony that Harris was *engaged* to Rochelle Harris, lived elsewhere, and only stayed with Rochelle Harris occasionally. Evid. Tr. 69. Harris testified that he had told his counsel during their initial meeting that the complaining witness owed him money. Evid. Tr. 58-62. Harris testified that he had told his counsel that the complaining witness's bicycle was stolen and Harris used his wife's car to help look for the bicycle and to drive him to and from his job and school. Evid. Tr. 58-59. Harris testified that he also told his counsel that Harris and Jones had driven Harden to the bank at Harden's request to withdraw the money Harden owed Harris. Evid. Tr. 60-62. There was no shotgun involved, and Harris denied ever owning a weapon. Evid. Tr. 63. Harris denied that he had told his counsel that he had coerced money from the complaining witness on previous occasions. Evid. Tr. 62.

Harris also testified consistently with Jones about the altercation with the complaining witness that occurred on January 15, 2003. Harris testified that it was Stefan Jones who had the knife on that occasion, rather than Harris, and that Jones only picked up the knife after the complaining witness produced what appeared to be a gun but turned

13

out to be an air rifle.  Evid. Tr.  65-66.  Harris testified that his role in the altercation was limited to trying to separate Jones and Harden, and that Harris was not aware that Jones had the knife.  *Id.*  Harris also testified that Harden was injured accidentally in the struggle. *Id.* at 66.  Harris testified that he told all of this to his counsel.  Evid. Tr. 67.

Contrary to counsel's testimony, Harris testified that he had never agreed not to have any witnesses at his criminal trial and believed, up to the end of the trial, that Stefan Jones, Rochelle Harris, and Phillip Franklin were going to testify on his behalf at trial.  Evid. Tr. 71.  Harris also testified that his attorney told him that he could not testify at trial himself because he had prior felony convictions for receiving and concealing stolen property and for uttering and publishing.  Evid. Tr. 72.

On cross-examination, Harris conceded that he never told the court during the trial that he was unhappy with his trial counsel.  Evid. Tr. 75.  Harris also conceded that he never told the trial court during sentencing that he had wanted to testify but was not permitted to testify.  Evid. Tr. 75.  Harris stated that he had asked Rochelle Harris to provide an affidavit, but she has since remarried and Harris believed that her husband did not want her involved.  Evid. Tr. 76.

Following the hearing, the parties submitted supplemental briefs.  The case is now ready for adjudication.

## III.  STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Harris is entitled to the writ of habeas corpus if he can show that the state court's adjudication of his claim on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable

14

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Significantly, the Sixth Circuit has held that AEDPA's deferential standard of review does not apply when an ineffective assistance of counsel claim is based on substantial new evidence derived from a proceeding in federal district court, subject to very limited exceptions that are not applicable in this case. *Brown v. Smith*, 551 F.3d 424, 428–30 (6th Cir. 2008). "Simply put, deference under AEDPA is inappropriate, and not required by statute, where significant new evidence relevant to a petitioner's claim becomes available during federal habeas proceedings or the state courts improperly failed to consider significant evidence relevant to that claim." *Id.* at 438 (Clay, J., concurring).

## IV. DISCUSSION

A.  Failure to Investigate and Call Stefan Jones

Harris alleges that his trial attorney was ineffective for failing to investigate his case and present an adequate defense.  The primary basis for this allegation is trial counsel's failure to investigate and call Stefan Jones as a defense witness at trial.

The Michigan Court of Appeals, in considering this claim, stated that Harris was not denied a substantial defense by the failure to call Jones and that Harris had not overcome the presumption that his attorney's performance constituted sound trial strategy.  Significant new evidence on this claim came to light in the evidentiary hearing in this Court.  Consequently, the Court will review Harris's claim *de novo*.

1.  Legal Framework

a.  *Strickland*

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), "qualifies as 'clearly established Federal law'" for purposes of evaluating ineffective-assistance-of-counsel claims.  *Williams*, 529 U.S. at 391.  Pursuant to *Strickland*, a habeas petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.

A deficient performance requires showing "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* at 690.  Harris must, therefore, overcome a presumption that counsel's decisions might be

16

considered sound trial strategy.  *Darden v. Wainwright*, 477 U.S. 168, 185-87 (1986).

The prejudice prong of *Strickland's* test for claims of ineffective assistance of counsel requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  "Where there is relatively little evidence to support a guilty verdict to begin with (e.g., the uncorroborated testimony of a single witness), the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt."  *Brown,* 551 F.3d at 434-35 (citing *Strickland*, 466 U.S. at 696, and *Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005)).

### b.  The Duty to Investigate

"The decision to call or not call certain witnesses is exactly the type of strategic decision that the courts expect attorneys to make."  *Boykin v. Webb*, 541 F.3d 638, 649 (6th Cir. 2008) (collecting cases).    The duty to investigate, however, "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence."  *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "Constitutionally effective counsel must develop trial strategy in the true sense - not what bears a false label of 'strategy' - based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation."  *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007).  "Where counsel fails to investigate and interview promising witnesses, and therefore 'ha[s] no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy."  *Workman v. Tate,* 957 F.2d 1339, 1344 (6th Cir.

1992) (quoting *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir. 1984)).

"[A] failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).

"The focus in failure-to-investigate claims, then, is the reasonableness of the investigation (or lack thereof)." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010) (citing *Wiggins v. Smith*, 539 U.S. 510, 527 (2003)). "[T]he ultimate inquiry is whether the choice not to conduct additional investigation was "reasonable[ ] in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 691).

2.  Application

a.  Deficient Performance

Harris contends that his trial attorney should have investigated and called Stefan Jones as a defense witness because Jones would have testified that Harris did not commit any crimes, that he (Jones) and Harden were involved in the dispute, and that Harden wrongly attributed illegal conduct to Harris.   Credibility determinations are important here because the testimony of Harris's trial attorney on this issue differed in a number of critical areas from the testimony of Harris's other witnesses, namely, Stefan Jones, Daphne Harris-Jones, and Harris himself.  The State conceded at the evidentiary hearing that trial counsel was constitutionally ineffective if the Court believed Harris and his witnesses's testimony.

The Court observed the testimony of the witnesses at the evidentiary hearing and considered their credibility in light of the entire record.  The Court also considered the

18

potential bias of each of the witnesses.  All of the witnesses had some incentive to color their testimony.  Obviously Harris, Stefan Jones and Daphne Harris-Jones each have an incentive to lie, or color the truth, to have the Court grant the petition.  On the other hand, counsel for petitioner also has incentive to lie or color the truth.  His professional reputation, and quite possibly his license to practice law, are at stake.

The Court concludes in light of the entire record that the testimony of Harris, Stefan Jones, and Daphne Harris-Jones was more credible than the testimony of trial counsel. First, the Court notes that all the witnesses testified in a credible manner.  The testimony of Harris, Stefan Jones and Daphne Harris-Jones, however, was far more detailed than the testimony of trial counsel.  Harris, Stefan Jones and Daphne Harris-Jones also appeared to be testifying from present, if imperfect, memory of actual events.  On the other hand, trial counsel's testimony lacked details that tend to confirm present recollection of actual events.

Second, the Court specifically does not credit the testimony of trial counsel that Stefan Jones told trial counsel that Jones had no knowledge of the events comprising the charges against Harris.  The record is replete with references to Jones being present at each of the incidents charged.  Harden testified in the preliminary examination that Jones participated in each of the armed robberies and in the assault.  His statements to the police also discuss Jones as being involved in at least some of the incidents.  Jones' wife retained counsel, both Jones and Daphne Harris-Jones met with counsel at length and discussed the case with counsel, and both testified credibly that Jones told counsel that he was present at each of the incidents.  Jones was clearly a critical witness for the defense, and even a cursory review of the pretrial discovery would reveal this to a competent attorney. The Court thus does not credit counsel's testimony that he does not remember talking

19

specifically about the incidents with Jones, but is certain that all witnesses told him that they had no knowledge of the events charged.[5]

Third, the Court does not credit trial counsel's testimony that he conducted a thorough investigation prior to trial. As discussed above, this testimony is undermined by his apparent failure to understand the critical importance of Stefan Jones. Moreover, counsel based his defense largely on bank records as is produced by the government and the inconsistencies he drew between the records and the testimony of the complaining witness, but counsel had no witness to testify to the accuracy of the bank records and apparently no documentary evidence.

Fourth, the Court does not credit counsel's testimony that he and Harris jointly agreed not to call any witnesses. Counsel's testimony in this regard does not appear to be based on present recollection and is vague. *See., e.g.,* Evid. Tr. 16 ("well we discussed the issue of potentially calling witnesses, umm, but he and I spoke about that I think we collectively decided that that was not in his best interest"). Harris's testimony to the contrary is more detailed and the Court finds it more credible.

The Court also does not credit counsel's testimony that Harris never told him that Harden owed money to Harris. Harris testified credibly and in detail at the evidentiary hearing as to the amount of money that he claimed Harden owed him and the reason for the debt. Evid. Tr. 58-62. Harris' story in this regard is consistent with the testimony of

---

[5]The State has argued on a number of occasions that defense counsel likely did not call Jones because he would have likely refused to testify given that he himself might face criminal charges. While this is a more plausible reason for the defense's failure to call Jones, this theory is actually contradicted by counsel's testimony, which is that Jones flatly denied any knowledge of the crimes.

Officer Gregory Soviak at Harris' criminal trial. Officer Soviak testified on direct examination in the prosecution's case-in-chief that he had contacted Harris after Harden made his initial complaint on January 3, 2003, and that Harris told Soviak on that date "that the complainant, Mr. Harden, owed him money" and that the money Harden withdrew on that date was in repayment of that debt. Trial Tr. 103-04. This information was also presumably in the police report that was admitted into evidence. In fact, Harris's new counsel at the preliminary examination raised the issue of debt and asked Harden whether the money he withdrew was money owed by Harden to Harris. Prelim. Ex. Tr. 26. In light of the repeated references in the record to a debt owed by Harden and the credible testimony of Harris to the contrary, counsel's testimony at the evidentiary hearing that Harris never told counsel that Harden owed Harris money is not credible.

The Court also does not credit counsel's testimony that Harris told counsel that Harris and Jones previously and repeatedly extorted money from Harden, just not on the occasion charged. First, Harden himself never stated that this happened, either in the preliminary examination, in his interviews with the police or in his testimony at trial. At the evidentiary hearing, Harris and Jones each testified credibly that this never happened.

Furthermore, counsel's current testimony is at odds with his apparently anguished statement at Harris' sentencing that "in this Court I have the opportunity to represent very few innocent people and I really believe at this point in time that I'm standing here at sentencing and that Mr. Harris is innocent; not not guilty, but is morally innocent of what he was convicted of. That's all I'm saying." June 5, 2003, Sentencing Tr. at 9. This is not a statement of counsel that has been told that his client was regularly extorting money from a disabled man, and the Court finds counsel's current testimony that such was the case to

be not credible.

There are other instances where the Court finds Harris's testimony to be more credible than that of trial counsel, but these suffice for the Court to conclude that counsel's performance at Harris's criminal trial was deficient and fell beneath the standard of constitutionally effective counsel. And because AEDPA does not apply here on de novo review, the Court need not defer to the state appellate court's conclusion that counsel's performance was not deficient.

b. Prejudice

The Court also finds that the deficient performance prejudiced the defense. The jury heard no evidence of Harris's defense that the complaining witness owed him money.[6] Evidence that Harris was owed money by the victim would tend to negate an essential element of the crime of armed robbery. *See People v. Holcomb*, 395 Mich. 326, 333 (1975) (evidence that defendant took money that he was entitled to negates intent element required for armed robbery). The jury in Harris's trial had no opportunity to consider this complete defense to the most serious of the charges against Harris.

The jury heard no testimony that Harris claimed not to have owned a gun and that no gun was present at either time Harris took Harden to the bank. As discussed above, the Court finds credible Stefan Jones' testimony that he was ready, willing and able to testify that, to his knowledge, Harris did not use a firearm, as charged by the State and as testified by Harden. Harris also testified at the evidentiary hearing that he did not use or possess

---

[6]The jury did hear Officer Soviak testify during the prosecutor's case in chief that Harris claimed in their interview that Harden owed Harris money, but the defense never developed that testimony and never referred to it during closing argument.

a gun, and was told by his counsel that he could not testify because of his prior felony convictions.  Evidence that Harris did not possess or use a gun would negate one of the essential elements of the crime of armed robbery and one of the essential elements of the crime of felony firearm.  Counsel's decision not to present any affirmative evidence that Harris did not use a gun falls below the standard for constitutionally effective assistance of counsel.

Harris was also tried and convicted of one count of assault with intent to do great bodily harm less than murder relating to the incident on January 15, 2003.  The jury heard no testimony that it was Jones, not Harris, who used the knife that wounded Harden on January 15.   While use of a weapon is not an essential element of the crime, *see People v. Van Diver*, 80 Mich. App. 352, 356 (1977), evidence that Harris did not use a knife, and did not know that Jones had a knife, would undermine the State's evidence on the element of intent.   Evidence that Harden had what Harris believed to be a firearm would also have entitled Harris to a jury instruction on self defense.  *See People v. Williams*, No. 238124, 2003 WL 1985255, at *1-2 (Mich. App. April 29, 2003) (unpublished); *People v. Johnson*, No. 280290, 2008 WL 5002927, at *1 (Mich. App. Nov. 25, 2008) (unpublished).  There is also evidence that Harris lived in the house where the assault took place, which would permit him to assert self defense without the necessity of retreating.  Mich. Comp. Laws § 768.21c(1).  Counsel's failure to offer any evidence that Harden was armed on January 15, 2003, and his failure to offer any evidence that Harris lived in the same house as the victim, prejudiced his defense, especially given the fact that the State's case rested on the testimony of the complaining witness.  *See Brown*, 551 F.3d at 434-35.  There is at least a reasonable possibility that the result would have been different had counsel investigated

23

and called Jones to testify.

### 3. Conclusion

Harris's trial attorney performed deficiently in failing to investigate and produce Stefan Jones as a defense witness at trial, and, for the reasons given above, the deficient performance prejudiced the defense. Therefore, Harris's Sixth Amendment right to effective assistance of counsel was violated. The writ of habeas corpus is granted on this claim.

### B. Failure to Call Phillip Franklin

Phillip Franklin stated in an affidavit signed in October of 2005 that, near the end of 2002 and during the beginning of 2003, Harris was transporting Harden to work and school, and that Harden owed Harris money for taking him to work and school. Franklin states that, if called to testify, he would testify to these facts.

Harris alleges that trial counsel should have called Phillip Franklin as a defense witness to testify that Kenneth Harden owed Harris money. The State argues that this claim is procedurally defaulted because Harris did not raise the claim on direct review and because the state courts denied leave to appeal pursuant to Michigan Court Rule 6.508(D).

### 1. Procedural Default

"When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review. " *Seymour*

24

*v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977), and *Picard v. Connor*, 404 U.S. 270, 275-80 (1971)).  "[P]rocedural default results where three elements are satisfied:  (1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim."  *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

All three elements of procedural default were satisfied in this case.  First, there is a state procedural rule applicable to Petitioner's claim.  Mich. Ct. R. 6.508(D)(3) generally prohibits state courts from granting relief from judgment if the defendant alleges nonjurisdictional grounds that could have been raised on appeal from the conviction or sentence.[7]  Petitioner violated this rule by failing to raise his claim about Phillip Franklin on direct review of his conviction.

Second, the state courts enforced the rule.  The trial court, the Michigan Court of Appeals, and the Michigan Supreme Court cited Rule 6.508(D) when denying relief on collateral review of Harris's convictions.  The state courts' reliance on Rule 6.508(D) is a sufficient basis for this Court to conclude that the orders were based on a state procedural bar.  *Burroughs v. Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002).

Third, when deciding whether a state procedural ruling is independent and adequate,

---

[7] An exception exists when the defendant demonstrates "good cause for failure to raise such grounds on appeal" and "actual prejudice from the alleged irregularities that support the claim for relief."  Mich. Ct. R. 6.508(D)(3)(a)–(b).

courts ask "whether the state rule in question was firmly established and regularly followed." *Beard v. Kindler*, 130 S. Ct. 612, 617 (2009) (quotation marks and citation omitted). Rule 6.508(D) was adopted in 1989 and therefore was firmly established and regularly followed before Petitioner appealed his convictions. Thus, "the procedural bar set forth in Rule 6.508(D) constitutes an adequate and independent ground on which the Michigan courts may rely in foreclosing review of federal claims." *Akrawi v. Booker*, 572 F.3d 252, 261 (6th Cir. 2009) (citing *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005)).

### 2. "Cause" and Prejudice

Having concluded that all three elements of a procedural default are present, the next question is whether Petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Petitioner alleges that his appellate attorney's ineffectiveness in not raising his claim in the appeal of right provides the requisite "cause."

Constitutionally ineffective assistance of counsel is "cause" for a procedural default. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To establish ineffective assistance of trial or appellate counsel, Harris must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Hoffner v. Bradshaw,* __ F.3d __, No. 08-4013, 2010 WL 3724790, at *9 (6th Cir. Sept. 23, 2010) (citing *Strickland,* 466 U.S. at 687-88, and *Smith v. Robbins*, 528 U.S. 259, 283 (2000)).

To prove deficiency, [the petitioner] must show that "counsel's representation

26

fell below an objective standard of reasonableness." *Id.* at 688. Prejudice can be shown by proving "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

*Id.*

Harris has not established that he told his appellate attorney about Phillip Franklin. The Court therefore finds that appellate counsel was not ineffective for failing to allege on appeal that trial counsel should have called Phillip Franklin as a witness.

The Court need not determine whether Harris was prejudiced by the alleged constitutional violation because he has not established "cause." *Tolliver v. Sheets*, 594 F.3d 900, 930 n.13 (6th Cir. 2010). The "cause and prejudice" requirement may be overlooked, however, "[i]f a petitioner presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust v. Zent*, 17 F.3d 155, 162 (6th Cir. 1994) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To be credible, however, "such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Petitioner has not submitted any new and reliable evidence of actual innocence, nor established "cause" for his failure to raise his claim in the appeal of right. Therefore, his claim about Phillip Franklin is procedurally defaulted.

## C. The Failure to Call Harris, Daphne Harris-Jones, and Rochelle Harris

In his post-hearing brief, Harris alleges for the first time that his trial attorney also should have called him (Harris), his sister Daphne Harris-Jones, and his ex-wife Rochelle

Harris as witnesses at trial. Harris did not exhaust state remedies for these claims and, for the following reason, the Court finds that he no longer has an available state remedy to exhaust.

Other than a direct appeal, the only post-conviction remedy available to convicted defendants is to file a motion for relief from judgment in the trial court pursuant to Mich. Ct. R. 6.502. Petitioner has already filed one motion for relief from judgment, and state law prohibits the filing of a second or successive motion unless the defendant alleges a retroactive change in the law or a claim of new evidence. Mich. Ct. R. 6.502(G). Petitioner is not relying on a change in the law or on new evidence. Therefore, he is not eligible to file another motion for relief from judgment in the trial court, and he lacks an available remedy to exhaust. When, as here,

> a petitioner has failed to fairly present federal claims to the state courts, and a state procedural rule now prohibits the state court from considering them, the claims are considered procedurally defaulted. *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002). While in such situations the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts results in a procedural default of those claims that bars federal court review. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

*Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 3274 (2010). The question becomes whether cause and prejudice exist to excuse the failure to present the claim in the state courts, or whether a miscarriage of justice will result if the Court fails to address the claim. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Rust*, 17 F.3d at 160-62.

Harris alleges that his appellate counsel was ineffective for failing to raise his

procedurally defaulted claim in the appeal of right. However, this claim is itself procedurally defaulted, because Harris never claimed in state court that his appellate attorney was ineffective for not challenging trial counsel's failure to produce Harris, Daphne Harris-Jones, and Rochelle Harris as witnesses. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (holding that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted").

Harris has not satisfied the "cause and prejudice" standard for procedurally defaulted claims, and the exception for miscarriages of justice does not apply because Harris has not submitted any new evidence of actual innocence. *Cf. Schlup*, 513 U.S. at 324 (explaining that a claim of actual innocence must be supported by "new reliable evidence . . . that was not presented at trial"). Therefore, his claim regarding trial counsel's failure to call him, Daphne Harris-Jones, and Rochelle Harris is procedurally defaulted and barred from substantive review.

## D. Failure to Investigate a Criminal Charge against Harden

Harris alleges in his initial habeas petition, which he filed *pro se*, that his trial attorney was ineffective for failing to investigate whether Kenneth Harden had ever been convicted of a crime. According to Harris, Harden was arrested before trial on a felony weapon charge. This evidence, alleges Harris, could have been used to impeach Harden with testimony that he was completely unfamiliar with guns.

The Court finds it unnecessary to analyze this claim because Harris did not raise it in his pre-hearing supplemental brief, at the evidentiary hearing, or in his post-hearing supplemental brief. The Court considers the claim abandoned.

## IV. CONCLUSION

Harris was deprived of effective assistance of counsel by his trial attorney's failure to call Stefan Jones as a witness. Accordingly, the petition for writ of habeas corpus (Docket No. 1) is **CONDITIONALLY GRANTED**. The State shall release Harris unless, within ninety days, it takes steps to retry Harris.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: September 30, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 30, 2010, by electronic and/or ordinary mail.

s/Alissa Greer
Case Manager